## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 18-230 |
| v. | ) | |
| | ) | Judge Robert J. Colville |
| | ) | |
| KRIS JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

COLVILLE, United States District Judge.

Presently pending before the Court is Defendant's Motion to Suppress (ECF No. 42).  He has moved to suppress the evidence recovered from 1613 Antrim Street ("the Residence") on November 9, 2017, including seized drugs, drug paraphernalia, guns and ammunition and indicia connecting him to the room in the Residence. He moves to suppress the evidence because the information used to obtain the warrant was, he argues, gleaned from an unlawful protective sweep.

For the reasons stated herein, the motion will be denied.

## I. BACKGROUND

On October 1, 2019, Mr. Johnson was charged by Superseding Indictment (ECF. No. 25) as follows.  Mr. Johnson is charged at Count 1 with possession with intent to distribute heroin and 28 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii) and 841(b)(1)(C); at Count 2 with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and at Count 3 with possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

1

Mr. Johnson moved to suppress the evidence against him arising from the execution of an arrest warrant on Durrell Calhoun ("Calhoun") at the Residence in Pittsburgh's North Side neighborhood.

The Government opposed the motion to suppress in an omnibus response to all pretrial motions (ECF No. 51).  On July 13, 2021, after multiple hearings were scheduled and continued due to the ongoing COVID-19 pandemic, the Court held an evidentiary hearing on the Motion to Suppress. (ECF No. 103).  Detective Sean Feeney and Special Agent O'Sullivan testified, and multiple documents were introduced and admitted into evidence, including:  numerous photographs of the interior and exterior of the Residence, sealed portions of the grand jury testimony of Calhoun, Shannon King, and Special Agent O'Sullivan, a final version of the incident report from the Allegheny County Sheriff's Office, various items found at the Residence, the application for a search warrant, Shannon King's voluntary statement dated November 9, 2017,  the arrest warrant for Calhoun dated June 1, 2017, the NCIC report  of Durrell Calhoun dated November 9, 2017, and the signed *Miranda* warning for Shannon King dated November 9, 2017.

At the end of the evidentiary hearing, the evidentiary record for the suppression motions was deemed complete.  A transcript of the hearing was prepared.  (ECF No. 110) ("Tr.").

Following the hearing, counsel for Mr. Johnson filed a post-hearing Proposed Findings of Fact and Conclusions of Law in support of his motion (ECF No. 114), and counsel for the Government filed a post-hearing Proposed Findings of Fact and Conclusions of Law. (ECF No. 113). The Government also filed a Response to Mr. Johnson's Proposed Findings of Fact and Conclusions of Law (ECF No. 115). Mr. Johnson filed a Notice of Correction.  (ECF No. 116). The matter is now ripe for disposition.

## II. FACTUAL FINDINGS

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). Accordingly, a district court judge assesses the credibility of witnesses, weighs the evidence, and draws any appropriate conclusions and inferences from the evidence. *Id.*

As noted *supra*, the Government called one witness to testify at the suppression hearing: Detective Sean Feeney. Defendant called Special Agent O'Sullivan, case agent from the Bureau of Alcohol, Tobacco and Firearms. Based on the Court's estimation and experience, coupled with the Court's personal observation of the witnesses' testimony and demeanor as witnesses, and in light of the Court's consideration of their testimony in the context of all of the admissible evidence before the Court, the Court finds and concludes that both witnesses testified credibly.

A. Testimony of Deputy Sean Feeney

Deputy Sean Feeney, a 14-year veteran of the Allegheny County Sheriff's office, was present at the scene the day the Allegheny County Sherriff's Office executed the arrest warrant of Calhoun, and his testimony was overwhelmingly consistent with the incident report entered into evidence as Government's Exhibit 4. Deputy Feeney has participated in "hundreds, if not thousands," of arrest warrant execution attempts, and explained based on his training and experience that dangers encountered in executing an arrest warrant at a home include the "danger of an armed subject, barricaded subject, fleeing subject, hiding subject, other individuals who want to aid the subject in fleeing or fighting or hiding, or other armed individuals that aren't the subject." Tr. at 43. He also explained there is a concern of dangers from individuals who may be located on upper floors of residences. Tr. at 45. Law enforcement takes steps to lesson dangers,

3

as matter of policy, such as not parking marked vehicles within the line of sight of a residence. Tr. at 45.

Deputy Feeney described the Residence as being in a high crime area.  Tr. 46-47.  It is a three-story row house, attached on either side to two other row houses, and has two entry/exit points, i.e. the front and back doors.  Tr. at 47. *See also* Government Exhibit 1. The third floor of the Residence has a window that faces the street, which according to Deputy Feeney raises a concern about being shot at from above. Tr. at 47-48. He explained the Residence presented certain tactical concerns because the "stairs are right in the middle of the house [and they] led both to the second and third floors." Tr. at 47. In structures similar to the Residence, Deputy Feeney has encountered individuals concealed in various places including inside walls, closets, and clothes dryers. Tr. at 49, 168. One of Deputy Feeney's primary concerns in making this arrest was "other occupants that could possibly be armed and want to aid the subject in his escape or fighting us or harming us." Tr. at 49.

The arrest warrant for Calhoun was a bench warrant issued by the Family Division for direct criminal contempt. It was executed by members of the Western Pennsylvania Fugitive Task Force.  Such warrants, according to Deputy Feeney, could either arise from the individual not appearing at court or for failure to pay child support, and are not criminal matters but rather civil matters.  Tr. at 133-137.

On the day of the execution of the warrant, Task Force members met at 7:00 a.m. to discuss their plan.  Tr. at 135. The Task Force consisted of five members, each of whom played different roles in setting up a perimeter to execute the arrest warrant. Tr. at 141. Task Force members communicated with each other using a TAC Channel, described as a device like a walkie-talkie. Tr. at 140. The Residence's only two points of entry and exit are the front and

4

back door, and both places were covered by Task Force members. Tr. at 143. One member of the

Task Force was on the sidewalk/street area, another one went to the back of the Residence, and

three, including Deputy Feeney, approached the front door. Tr. at 141. The person on the

sidewalk/street area, watched the front windows. Tr. at 142. Deputy Feeney testified that the

Task Force member that went to the back of the Residence did not report seeing any movement

through any of the windows in the back of the Residence including seeing any person upstairs.

Tr. at 142. Likewise, the Task Force member stationed in the sidewalk/street area in the front of

the Residence, did not see any person or movements in the windows facing the front of the

home. Tr. at 142, 143. Deputy Feeney was specifically asked about the third-floor window facing

the street and agreed that no movement was seen from the Task Force from that window. Tr. at

143:2-5. Deputy Feeney testified that in addition to not seeing movement from the two areas of

exit and all windows during the perimeter check, Task Force members also did not see any

weapons or people. Tr. at 143, 144.

On cross-examination, Deputy Feeney agreed that the Task Force was not briefed with

information that Calhoun had a warrant for any other crime than the direct criminal contempt. Tr.

at 137. Deputy Feeney also agreed that no information was provided to the Task Force which

might indicate that Calhoun was being investigated for, or suspected of, another crime. Tr. at

137.  The Task Force knew that Calhoun was living with his girlfriend Shannon King at the

Residence, and that she could possibly be at the Residence during the execution of the arrest

warrant. Tr. at 138. Other than King and Calhoun, no information was available to the Task

Force that anyone else could be at the Residence. Tr. at 139. With regards to King, no

information was presented to the Task Force that she had any violent criminal history, drug

history, or any criminal history at all. Tr. at 139. Deputy Feeney testified that King was not

wanted for any crime, and that the Task Force had no information that either King or Calhoun

were associating with any violent individuals. Tr. at 139. Deputy Feeney admitted that there was

no information presented to the Task Force that the Residence was a place suspected of drug

distribution, drug production, or being used as stash house. Tr. at 139, 140.

On November 9, 2017, Deputy Feeney approached the Residence along with Detective

Randy Grossman. The officers knocked on the door, and the door was answered by Shannon

King. Tr. at 52. Detective Grossman inquired of King as to the whereabouts of Calhoun, to

which King advised the officers Calhoun was inside the Residence and that she would retrieve

him.  Tr. at 52.  In doing so, King attempted to close the door, however, Detective Grossman

placed his foot in the door, prevented the door from closing. Tr. at 52. Deputy Feeney, based on

his training and experience, perceived King's attempt to close the door as cause for being on

elevated alert that she might have been attempting to buy time for Calhoun to flee, hide, harm

himself, or barricade himself.  Tr. at 52-53; *see also* Tr. at 181 ("She attempted to close the door

on us and that raised alarms for us.").

Deputy Feeney and Detective Grossman followed Shannon King down the hallway;

Detective Feeney said they were only a "few steps" behind her as she walked down the hall

towards the end of the hall where Calhoun was seen sitting on a couch. Tr. at 148, 149.

According to Detective Feeney, it took minutes, "maybe even seconds", to knock and announce,

meet King at the door, follow her down the hallway and spot Calhoun. Tr. at 150. Detective

Feeney testified that while they were knocking and announcing and walking down the hallway to

arrest Calhoun, no member from the Task Force alerted them about seeing any movement of

anyone in any of the windows including the second and third floor windows or any attempts of

anyone trying escape from the back door. Tr. at 150, 151. Detective Feeney admitted that he did

not hear any noises of anyone upstairs as they were walking down the hallway to get Calhoun. Tr. at 151.

Deputy Feeney had observed that the couch that was occupied by Calhoun was located approximately four to five feet from a set of stairs leading to the upper floors of the Residence. Tr. at 53.  Deputy Feeney further observed that one could clearly have a line of sight from the top of the stairs on the third floor to the bottom of the stairs on the first floor. Tr. at 54. This testimony was later weakened on cross examination.

At the time of the arrest, Calhoun was wearing undergarments and a t-shirt, in a state of relative undress. Tr. at 54 ("[H]e was in his boxers and maybe a T-shirt."); Tr. at 156 ("I think he was in his boxers. He was in some sort of undress, some state of undress. Wasn't dressed to go outside."); Government Exhibit 4 (hereinafter "Incident Report") at 3 ("he had no socks or shoes on").  Calhoun requested he be permitted to obtain clothing.  Given his state of undress and that he was compliant, the officers were willing to retrieve additional items of clothing for him consistent with their general policies. Tr. at 54; Incident Report at 3.  Detective Feeney testified credibly that Calhoun gave him consent to retrieve the clothing.

The arresting officers advised Calhoun and King that clothing could be obtained by the officers following a security sweep of the premises for officer safety as Calhoun advised that the clothing was located on a separate floor in the second-floor bedroom. Tr. at 54; Incident Report at 3. Upon being advised that the officers would be performing a safety sweep prior to obtaining Calhoun's clothing, King became "agitated and nervous, screaming 'Why do you have to go upstairs? There is nobody else here!'" Incident Report at 3. King's reaction again caused Deputy Feeney to be increasingly alert for potential dangers. "It was alarming. It made us wonder if there was somebody else up there or some threat to us or the other people in the house."  Detective

Feeney further testified, "She was agitated, seemed concerned that we would be going to the second and third floor for whatever reason." Tr. at 180. The government asked:

> Q. Particularly for this house, why would you want to include in the third floor in a protective sweep [sic]?
> A. If there was somebody on the third floor, they would be able to see you on the street as you're exiting or could be hiding up there. If they're armed, that's potentially dangerous for us and other people in the home.

Tr. at 49-50.

The process of getting Calhoun's clothing would take some time, according to Detective Feeney, because after retrieval, they would search the clothing items, take the restraints off him so that he could dress himself, and then re-restrain him. Tr. at 59. Detective Feeney testified they could not give Calhoun an opportunity to put his clothes on, unrestrained, until they had insured there were no other threats in the residence. Tr. at 160. Detective Feeney further explained that prior to leaving the home, the team had to take certain steps with regard to the warrant, such as making phone calls to determine if the court wanted Calhoun brought directly to them or lodge Calhoun at the Allegheny County Jail, as well as run Calhoun's information through databases to determine if there were additional warrants for his arrest. Tr. at 58.

In addition, during the subsequent execution of the arrest warrant that day, there were "a lot of people on the street observing and there was individuals who attempted to walk into the residence while we had it secured awaiting the search warrant." This raised a level of concern regarding safety, and three additional officers were called to respond to the location.

After Calhoun's request for additional clothing items, officers ascended to the second-floor bedroom to retrieve clothing pursuant to Calhoun's consent and directions. See Tr. at 59 (Calhoun had "to explain to [law enforcement] the exact items that he wants because we are not going to allow him to fetch the items.") The officers determined the potential existed for harm to

8

them, given King's alarming behavior. The most dangerous location from the perspective of the

trained members of law enforcement was the stairway. Deputy Feeney explained, "[O]nce we

were on the second floor, we had to clear the third floor because the stairway was the most

dangerous place in that house." Tr. at 57. "[T]here is still a line of sight to [the second floor]

landing from the third floor…an armed person could just step over the landing and harm us." Tr.

at 55.

   Deputy Feeney then performed a brief protective sweep of locations where a dangerous

individual might be concealed. According to Detective Feeney's credible testimony, the

protective sweep of the third-floor bedroom took approximately five seconds. Tr. at 58. During

the protective sweep of the third floor, Deputy Feeney observed, in plain view, what appeared to

be heroin. Tr. at 57; Incident Report at 3. Upon this discovery and after securing the space,

Deputy Feeney informed Detective Grossman of the discovery.  Detective Grossman later

applied for and obtained a search warrant.  Tr. at 57, 170.   On the application of their search

warrant for the Residence, the search warrant affiant included Kris Johnson, a/k/a Kris Dixon,

along with Shannon King and Durrell Calhoun, as an "owner, occupier, or possessor" of the

Residence. Tr. at 90; *see also* Defense Ex. "B" (Application for Search Warrant by Randy

Grossman.).

   Both King and Calhoun were provided *Miranda* warnings.  Tr. at 170-1; Incident Report

at 3. Calhoun was questioned about the drugs in the third-floor bedroom and responded that he

had no knowledge of the drugs.  Incident Report at 3. Calhoun also later provided grand jury

testimony stating he did not go to the third floor. Government Exhibit 2 at 7-8. Calhoun further

testified to the grand jury that upon being presented a photograph of the defendant, that he knew

the defendant as "Kris" and that he was unaware of the defendant's last name, and further that

the defendant was occasionally present at the Residence for functions. *Id.* at 8.

Officers also interviewed King at the Residence on the day of the search and she signed a

written statement that reads, "third floor front bedroom, Christopher Dixon." Tr. at 85; Defense

Exhibit A.  In the report, the officers wrote that King stated that Johnson "stayed" in the third-

floor bedroom, and the officers listed him as an "occupant" on the search warrant for the

residence. The officers used the names Kris Dixon and Kris Johnson as input items in law

enforcement databases and obtained a photograph of Kris Johnson.  They showed King a picture

of Johnson and she identified the photograph as her brother Kris.  Further research into Kris

Johnson revealed he was already wanted on several bench warrants and was on the Allegheny

County Sheriff's Office Most Wanted list.  Incident Report at 3.

King also testified before the grand jury. She testified that the defendant did not live at

the Residence, had never lived there, never stayed in a bedroom in the Residence, and that he did

not have a key. King, however, testified that she did allow Johnson to store items in a third-floor

bedroom at the Residence, and that Johnson would come to the Residence to walk the dogs three

or four days a week when she was not at home. King testified that Johnson "had a place in

McKees Rocks, and then he went back to his grandmother's house." According to King, Johnson

did not pay rent, but he would occasionally provide her money for various items. (Exhibit 3).

Neither her statement nor her grand jury testimony established the last time the defendant was at

the Residence.

After the search warrant was executed at the Residence officers found narcotics, firearms,

and other evidence alleged to be associated with illegal narcotics trafficking.  They also

recovered the following possible indicia of Mr. Johnson's habitation in the third floor bedroom: a

debit card, a Pennsylvania Department of Corrections ID card, a Valentine's Day Hallmark card

addressed to Kris Johnson, photographs of Kris Johnson, a Verizon bill, and a bail hearing

notice. Tr. at 62, 81. They also found "male clothing hanging in the closet and men's shoes

organized on the floor near the dormer window." Tr. at 62. The debit card was unexpired, the

bed was made, and the clothes and shoes were "neatly" arranged. Tr. at 77. Other signs of Mr.

Johnson's possible habitation in the room included a TV, bed, and nightstand – all of which Mr.

Johnson's parents later had removed from the home through a moving service – and cell phones,

Tr. at 77, 96.

After reviewing a crime lab report concerning DNA and fingerprint analysis, Deputy

Feeney testified that no fingerprints or DNA were found on any of the guns, bullets, or the

two scales found within the third-floor bedroom. Tr. at 104,105. Deputy Feeney also testified

that Mr. Johnson's fingerprints or DNA were also not found on the extension clip magazine

belonging to the semi-automatic rifle found. Tr. at 106.

B.  Testimony of Special Agent Ryan O'Sullivan

At the Hearing, Special Agent Ryan O'Sullivan ("O'Sullivan") from the Bureau of

Alcohol, Tobacco and Firearms ("ATF") was called to testify by the defendant. O'Sullivan

credibly testified that he reviewed Geotime software maps that were generated based on the

cellular usage of the defendant from the three days prior-to and until November 9, 2017. Tr. at

186-187. O'Sullivan testified the review revealed that the cellular usage during that timeframe

took place on "two of the three faces of the cell tower" (Tr.at 187) and that the Residence fell

within that physical area. The review revealed that the defendant used the cellular phone in that

area generally, as opposed to "the opposite end of the City of Pittsburgh." Tr. at 187.

O'Sullivan further testified that, based on his training and experience, the defendant was using the space he had access to at the Residence for the purpose of storing drugs and guns. Tr. at 194. The ATF knew Mr. Johnson had another address in McKees Rocks, Pennsylvania.  He testified that the defendant likely utilized the location as a stash house and was not where the defendant "[laid] his head every night". Tr. at 197.  The opinion was based, in part, on the defendant's extensive criminal record that included multiple drug-trafficking convictions and firearm-related offenses. Tr. at 198.

## III.  Legal Standard

The burden of proof on a motion to suppress is proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974). "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter,* 416 F.3d 256, 261 (3d Cir. 2005).

## IV.  Discussion

### A.  Standing

The government argues that Mr. Johnson lacks standing to challenge the search of the Residence, because, according to the government, he has failed to establish he had a reasonable expectation of privacy on the date of the protective sweep. *Oliver v. United States*, 466 U.S. 170 (1984). We disagree.

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his

expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citing *Rakas v. Illinois*, 439 U.S. 128, 143-44, n.12 (1978)). A reasonable expectation of privacy has "a source outside the Fourth Amendment, either by reference to the concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." *U.S. v. Ellis*, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing *Katz v. United States*, 389 U.S. 347, 361(1967)). "Under *Katz*, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." *Id*.

In viewing the facts presented at the hearing and all record evidence, considering the totality of the circumstances, we find, albeit hesitantly, that Mr. Johnson has standing to challenge the search. Shannon King, the leaseholder of the home, informed police that Mr. Johnson was a tenant of the bedroom, and his name was placed as one of the owners, occupants or possessors of the premises on the application for the search warrant.  The evidence is unclear as to whether Mr. Johnson was actually a tenant of the house; neither Calhoun nor King testified at the hearing; there is no evidence of a signed lease, that the defendant had a key, or paid regular rent.  Calhoun testified before the grand jury that the occupants of the Residence were himself, King and some children, but that Johnson was only at the Residence for social functions.  King also testified that the Defendant did not live at the Residence and had never stayed in the bedroom, although again, she testified she allowed him to store items in the third-floor bedroom. He had her permission to place items there and stored his clothing or property there.  He had

13

furniture in the room, and a debit card and Verizon bill were found there, and others described

him as being at social functions hosted there. Whether or not the residence was being used as a

stash house remains a fact in dispute. At this juncture, however, the Court finds that for the

limited purpose of deciding the present motion, the Defendant has standing sufficient to

challenge the search.

### B.  Protective Sweep under *Buie*

A quick and limited, though warrantless, search of a residence incident to an arrest can be

reasonable (and thus lawful) under the Fourth Amendment.  *Maryland v. Buie*, 494 U.S. 325, 334

(1990). Such "protective sweeps" are meant to ensure "that the house in which a suspect is being,

or has just been, arrested is not harboring other [dangerous individuals] who could unexpectedly

launch an attack."  *Id*. at 333. These sweeps are limited to a "cursory visual inspection of those

places in which a person might be hiding." *Id*. at 327. *Buie* sets forth two "prongs" under which a

protective sweep may be considered reasonable. *Buie*'s first prong deems a sweep reasonable

where, "as an incident to the arrest ..., as a precautionary matter and without probable cause or

reasonable suspicion, [officers] look in closets and other spaces immediately adjoining the place

of arrest from which an attack could be immediately launched."  *Id*. at 334. Under *Buie*'s second

prong, "[a] protective sweep is permitted, inter alia, when officers possess 'articulable facts

which, taken together with the rational inferences from those facts, would warrant a reasonable

prudent officer in believing that the area to be swept harbors an individual posing a danger to

those on the arrest scene.'" *United States v. Howard*, 729 F. App'x 181, 186-87 (3d Cir. 2018)

(quoting *Buie*, 494 U.S. at 334). *Buie*'s second prong is available whether the defendant is

arrested inside or outside the home; the first prong cannot apply if the defendant's arrest takes

place outside or even "just outside the home." *United States v. White*, 748 F.3d 507, 511-12 (3d

Cir. 2014).

14

Johnson argues that the upstairs bedroom was too remote for *Buie*'s first prong to apply,

and further, under *Buie*'s second prog, officers possessed insufficient articulable facts that any

dangerous individuals might have been in the bedroom or on the third floor.  The Government

responds, and the Court concurs, that the sweep of the second and third floor was reasonable

under *Buie*'s first prong because the upstairs bedroom was near enough, given the size of the

house, to the location of Calhoun's arrest.  The third floor was up a staircase from the second

floor where officers would be retrieving his clothing prior to processing him; the second floor

landing could be seen from the third floor.  As Deputy Feeney explained, an armed person could

step over the landing and harm them.  In addition, the third floor of the Residence, where the

heroin was seen in plain view, has a window which faces the street, raising a concern about

being shot at from above.  It was a place from which an attack could be launched when the

officers did, as they had been planning to do, take Calhoun out the front door of the Residence.

The government argues that the officers, while processing Calhoun, were within a direct line of

sight to the first floor, where the arrest occurred and where the officers were congregating.

While the photographs of the residence do not depict the first floor location to be in the line of

sight to the third floor, because Calhoun asked the officers to get his clothing from the second

floor, and given other circumstances of the layout of the house, the *Buie* prong I permits a

protective sweep of the third floor under the specific circumstances of this case.

Detective Feeney was located on the second floor landing to ensure the safety of the

officers who cleared the second-floor bedrooms and retrieved the clothing; he was within a direct

line of sight to the third floor when stationed there, and the "stairway was the most dangerous

place in that house."  Tr. at 57.   No door or other object obstructed the view or movement

between the second and third floor.  On balance, the protective sweep was justified under *Buie*

15

prong I as a search incident to arrest, regardless of probable cause or reasonable suspicion, as the spaces that were quickly searched were places from which an attack could be launched, from within the upper floors of the house, while the officers anticipated being in the Residence for some time.

Under factually similar circumstances, the court in *United States v. Guerrier*, 2019 WL 1877167 (M.D. Pa. April 26, 2019) held that a protective sweep was reasonable under *Buie*'s first prong, and denied the motion to suppress. There, officers swept an entire house and found evidence in plain view in the defendant's bedroom, which was not immediately above the doorway where the defendant was arrested, but on a different floor. The Court, citing *United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005), noted:

> "[t]he safety of the officers, not the percentage of the home searched, is the relevant criterion" under *Buie*. *Id.* at 287. "If an apartment is small enough that all of it 'immediately adjoin[s] the place of arrest' and all of it constitutes a space or spaces 'from which an attack could be immediately launched,' then the entire apartment is subject to a limited sweep...." *Id.* at 287-88 (quoting *Buie*, 494 U.S. at 334). Here, just as in *Thomas,* Guerrier's home was small and compact enough that an attack could have been immediately launched from every room in the house—particularly Guerrier's bedroom on the second floor, next to the stairway, directly above the place of arrest, and facing the street where officers were assembled. *See United States v. Green*, No. 16 CR. 281 (PGG), 2018 WL 6413485, at *17-20 (S.D.N.Y. Dec. 6, 2018).

Because we have found that the protective sweep was reasonable under Buie's first prong, we need to address whether the second prong of *Buie* further supports the officers conducting a protective sweep of the third floor.

## V. Conclusion

For the above stated, reason, Defendant's motion to suppress will be denied.  An appropriate order follows.

Dated:  December 14, 2021

*s/Robert J. Colville*
Robert J. Colville
United States District Judge

cc: record counsel